Ruby BEALE, Plaintiff,

v.

BIOMET, INC., Biomet Manufacturing, Corp., Biomet Orthopedics, Inc., and Biomet South Florida, Defendants.

No. 05–22941—GOLD.

United States District Court,
S.D. Florida.

June 15, 2007.

Allan Kanner, Cynthia S. Green, Kanner & Whiteley LLC, New Orleans, LA, Elizabeth Lineberger Tarumianz, Fred Thompson, III, Robin R. Anderson, Motley Rice LLC, Rhett D. Klok, Ness Motley Loadholt Richardson & Poole, Mt. Pleasant, SC, Roland W. Payne, Jr., Miami, FL, for Plaintiff.

Angela Teresa Puentes, Benjamine Reid, Gary Michael Pappas, Carlton Fields, Miami, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; CLOSING CASE

ALAN S. GOLD, District Judge.

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment [DE 103], filed April 9, 2007. Defendants originally filed a Motion to Dismiss [DE 67], which I converted to a Motion for Summary Judgment. The Motion for Summary Judgment seeks judgment against Plaintiff Rudy Beale in this case, and against Plaintiffs Daniel and Nancy Erb in Case Number 06–20692. The two cases were consolidated per my Order Following Telephonic Status Conference and Consolidating Cases dated May 24, 2006 [DE 55]. Although the plaintiffs in the two cases differ, the legal issues apply equally to both cases. After considering the arguments contained in the parties' briefs, and after hearing oral argument, I grant the Motion for Summary Judgment.

### I. BACKGROUND

The undisputed material facts are as follow: [1]

Both of the consolidated actions concern the surgical implantation of a partial knee prosthetic device known as a Biomet Repicci II Unicondylar Knee ("the device"). In Daniel Erb's case, Dr. Diaz (a nonparty to either lawsuit) implanted the device into his left knee on December 6,

---

[1]. Plaintiffs dispute many of the facts set forth by Defendants. However, the disputed facts are not material to the issues raised in Defendants' motion for summary judgment.

2000. (Erb First Amended Compl. ¶ 60). Dr. Diaz implanted the device into Rudy Beale's left knee on June 28, 2001. (Beale Second Amended Compl. ¶ 60).

The Unicondylar Knee is a prescription medical device. (Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, ¶ 1). The device is suitable for certain patients who, in the treating orthopedic surgeon's judgment, are appropriate candidates based upon the surgeon's evaluation of variables such as the patient's medical history, physical examination, x-rays, disease progression, pain syndrome, gait, age, weight, and activity level.[2] (Id. ¶ 4). The package insert to the device contains warnings to surgeons regarding patient selection, including certain risk factors such as weight control, activity level, and device wear or failure. (Id. ¶ 8).

Dr. Diaz was the treating orthopedic surgeon for both Plaintiffs. (Id. ¶ 9). Dr. Diaz has over 36 years of experience performing hip and knee joint replacement surgeries. (Id. ¶ 10). He received his medical degree in 1957 and spent eleven years in orthopedic surgery residence and fellowship programs. (Id.). Dr. Diaz was Board Certified in orthopedic surgery in 1971. (Id.). He performed between 150 and 400 joint replacement surgeries per year in the West Palm Beach area through 2006. (Id.). During his career, Dr. Diaz has likely performed over 10,000 joint replacement surgeries. (Id.). Between 2000 and 2001, Dr. Diaz performed approximately 400 surgeries involving the device at issue in this case, and found that they worked well for his patients. (Id. ¶ 14). Dr. Diaz implanted the device at issue in this case in approximately 700 patients over the years, and still believes in the product. (Id. ¶ 15).

Plaintiff alleges, and Biomet does not dispute, that Biomet engaged in certain marketing efforts to promote the device. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, p. 12–20). These efforts included sales visits to surgeons, advertisements in orthopedic journals, presentations at meetings of orthopedic surgeons, video demonstrations and literature about the product. (Id., p. 13–16). Biomet also sponsored articles written about its product. (Id.). In addition to marketing its product to physicians, Biomet marketed its product to the consumers. (Id., p. 16–20). Biomet created a tri-fold brochure for patients to review about the product, which was placed in physician's offices. (Id., p. 16). Biomet also has a website containing information about its products. (Id., p. 17). Dr. Diaz's office, through his office assistant, held seminars for prospective patients, where Biomet's brochure was provided to attendees. (Id., p. 19).

At deposition, Dr. Diaz testified to the following: (1) he read the package insert included with the device (Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, ¶ 16); he was aware of the risk that his patients might experience no improvement in their knee function after having the device implanted (Id. ¶ 20); he was aware of the risk that his patients would not be able to engage in impact sports, and might not be able to engage in non-impact activities (Id. ¶ 21); he was aware that his patients might not obtain the pain relief the hoped for (Id. ¶ 23); he was aware that his patients could not withstand the activi-

---

**2.** Plaintiffs claim that Dr. Repicci, the inventor of the device, stated in deposition that he did not consider weight to be a factor. However, that is immaterial, as the package insert noted the patient's weight as a factor, and Dr. Diaz, who implanted the devices into the Plaintiffs, believed that weight was a factor.

ty level of a person with healthy bone and tissue, and that excessive physical activity and trauma could cause the device to fail, break apart, or wear out (*Id.* ¶ 24); he was aware that a patient's excessive weight could cause the device to fail, break apart, or wear out (*Id.* ¶ 25); he was aware of the risk that if a component of the device failed or broke apart, it could cause further damage to the patient's knee (*Id.* ¶ 26); he was aware of the risk that his patients might need to have the device replaced in the future, and that they were merely postponing total knee replacement (*Id.* ¶ 27); he informed all of his patients that they were postponing the need for a total knee replacement (*Id.* ¶ 28).[3]

Dr. Diaz also testified that he was not influenced by Biomet or any Biomet literature in his determination of which patients were appropriate candidates for the device. (*Id.* ¶ 41). Instead, he relied upon his education, training, and experience. (*Id.* ¶ 47).[4] Biomet never made any representations that Dr. Diaz was its agent, and Dr. Diaz never consented to be the agent of Biomet, nor made any representations to that effect.[5] (*Id.* ¶¶ 49–51).

Both Plaintiffs allege that following the implantation surgery they experienced severe pain, and eventually needed revision surgery on their knees. (Beale Compl. ¶¶ 61, 62; Erb Compl. ¶¶ 61, 63).

Beale and Daniel Erb (together with his wife, Nancy Erb) brought separate lawsuits against Defendants in the Eleventh Judicial Circuit in and for Miami–Dade County. Defendants removed the lawsuits to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446 on the basis of diversity of citizenship.

Both Complaints allege the following four causes of action against Defendants: negligence/gross negligence; strict product liability; a violation of Florida Statutes § 501.201 *et seq.* (Florida Deceptive and Unfair Trade Practices Act, "FDUTPA")[6]; and negligent misrepresentation. In addition, Plaintiff Nancy Erb, wife of Plaintiff Daniel Erb, brings a claim for loss of consortium against Defendants.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

---

3. Plaintiffs claim that Dr. Diaz did not inform them of many of the risks associated with the device. However, as discussed below, whether Dr. Diaz informed the Plaintiffs of the risks is immaterial to Defendants' motion for summary judgment.

4. Plaintiffs claim that Biomet sponsored ghost-written articles extolling the virtues of the device, and that Dr. Diaz could have been influenced by those articles. As discussed below, even if Plaintiffs' assertion is true, it is immaterial to the relevant issues in this motion for summary judgment.

5. Plaintiffs claim that Dr. Diaz advertised that he was the only surgeon in the area trained to implant the device. However, this fact is immaterial to this motion for summary judgment.

6. Plaintiffs mistakenly refer to this as the Florida Consumer Protection Act, but cite the proper statute to state a claim under FDUTPA.

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney*, 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

Upon review of the record and the parties' arguments, I grant Biomet's motion for summary judgment.

## III. ANALYSIS

### A. Application of the Learned Intermediary Doctrine

 Biomet moves for summary judgment on the basis of the "learned intermediary doctrine." Florida recognizes the learned intermediary doctrine, which provides that, in cases of prescription drugs, the manufacturer's duty runs to the physician, rather than the patient. *Felix v. Hoffmann–LaRoche, Inc.* 540 So.2d 102 (Fla.1989).[7] Pursuant to the doctrine, a manufacturer has a duty to give a physician adequate warning of the risks associated with a prescription drug. *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So.2d 820, 822 (Fla. 5th DCA 1981). However, "failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated." *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir.1995). "Thus, the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had 'substantially the same' knowledge as an adequate warning from the manufacturer should have communicated to him."[8] *Id.*

7. The parties agree, and I concur, that Florida law governs in this diversity case.

8. To establish negligence under Florida law, plaintiff "must prove the existence of a duty to protect [him], a breach of that duty, and injury sustained as a proximate cause of that breach." *Clark v. Boeing Co.*, 395 So.2d 1226, 1229 (Fla. 3d DCA 1981). To state a claim for strict liability, plaintiff "must allege and prove the manufacturer's relationship to the product in question, the defect, the unreasonably dangerous condition of the product, and the existence of a proximate causal connection between the condition and the user's injuries or damage." *Id.* Thus, if Plaintiffs cannot show proximate cause, their claims for negligence and strict liability must fail as a matter of law.

## 1. The Learned Intermediary Doctrine in Florida

The first Florida court to apply the learned intermediary doctrine was the Fifth District Court of appeals, in 1981. *Buckner v. Allergan Pharms.*, 400 So.2d 820, 822 (Fla. 5th DCA 1981). At issue in the case was whether a warning on the packaging of corticosteroids were sufficient to warn the patient of the dangers associated with the drug. The court noted that no Florida cases had yet applied the learned intermediary doctrine; however, relying on Florida statutes and case law from other jurisdictions, it determined that the doctrine should be adopted in the state. The court noted that "Chapters 458, 465 and 500, Florida Statutes, evidences legislated public policy to rely on physicians and pharmacists to protect the consuming public from injury by product use when the product is a prescription drug. *See, e. g.,* §§ 500.02(1) and 500.151, Fla.Stat. (1979)." *Id.* at 822.

The court went on to say that:

A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs. Although we find no Florida case directly in point, this view is in accord with numerous decisions from other jurisdictions. *See, e. g., Chambers v. G.D. Searle and Company,* 567 F.2d 269 (4th Cir.1977) (applying Maryland law); *Givens v. Lederle,* 556 F.2d 1341 (5th Cir.1977) (applying Florida law); *Dalke v. Upjohn Company,* 555 F.2d 245 (9th Cir.1977) (applying Washington law); *Salmon v. Parke Davis and Company,* 520 F.2d 1359 (4th Cir.1975) (applying North Carolina law); *McCue v. Norwich Pharmacal Company,* 453 F.2d 1033 (1st Cir.1972) (applying New Hampshire law); *Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir.1966) (applying Missouri law); *Terhune v. A.H. Robins Company,* 90 Wash.2d 9, 577 P.2d 975 (1978); 28 C.J.S. Drugs and Narcotics Supplement § 57 (1974). *Compare Terhune,* (characterizing the philosophy as a well established rule) with *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974) (characterizing the special standard as an exception to the restatement general rule).

The court agreed with the rationale as explained in *Reyes,* which held that:

Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

*Id.*

Since *Buckner,* the doctrine has been recognized in other Florida courts, and the Florida Supreme Court has expressly stated that the learned intermediary doctrine is the law in the state of Florida: "Prescription or ethical drugs (which includes influenza vaccine) can be administered only under the direction of a physician,

and Florida law requires that the manufacturer provide an adequate warning only to the physician, or 'learned intermediary.' " *E.R. Squibb & Sons v. Farnes,* 697 So.2d 825, 827 (Fla.1997).

## 2. Application of the Learned Intermediary Doctrine to Prescription Medical Devices

The Florida state case law on the learned intermediary doctrine has dealt solely with prescription drugs.[9] Numerous other jurisdictions, however, have extended the doctrine to apply to prescription medical devices, as well as drugs. District courts in both the Middle and Northern Districts of Florida, for example, have held that the learned intermediary doctrine applies in cases of prescription devices. In *Baker v. Danek Medical,* 35 F.Supp.2d 875 (N.D.Fla.1998), a patient sued the manufacturer of pedicle screws, used in bone surgery. Relying on the Florida Fifth District Court of Appeal's decision, as well as decisions from various other jurisdictions, the district court held that the manufacturer was immune from suit under the learned intermediary doctrine. The court explained that, "[a]s spinal fixation devices are available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Id.* at 881. Similarly, in *Edgar v. Danek Med., Inc.,* 1999 WL 1054864, 1999 U.S. Dist. LEXIS 6431 (M.D.Fla.1999), *Wilson v. Danek Med., Inc.,* 1999 WL 1062129, 1999 U.S. Dist. LEXIS 6433 (M.D.Fla.1999), *Alexander v. Danek Med., Inc.,* 37 F.Supp.2d 1346 (M.D.Fla.1999), and *Savage v. Danek Med.,* 31 F.Supp.2d 980 (M.D.Fla.1999)-all cases involving pedicle screws-the courts held that the learned intermediary doctrine applies to manufacturers of prescription medical devices as well as prescription drugs.

In addition to these Florida district court cases, jurisdictions throughout the country have applied the learned intermediary doctrine to prescription medical devices. In *Ellis v. C.R. Bard,* 311 F.3d 1272, 1280 (11th Cir.2002), the Eleventh Circuit noted that while Georgia's learned intermediary doctrine-the same doctrine applied in Florida cases-has its roots in prescription drugs, it has repeatedly been applied to prescription medical devices as well. The Fifth Circuit noted that "[t]he great weight of the authority in other jurisdictions is to the contrary [to Plaintiff's assertion]; most courts have found that a medical device which must be prescribed and inserted by a physician falls under the learned intermediary doctrine." *McPheron v. Searle Laboratories, Inc.,* 888 F.2d 31, 33 (5th Cir.1989). *See, e.g., Adams v. Synthes Spine Co.,* 298 F.3d 1114, 1117 (9th Cir.2002)("Washington applies this rule not only to such medical products as vaccines for deadly diseases, but, as the Dalkon Shield case illustrates, much more broadly, to medical products where the physician acts as a 'learned intermediary between the manufacturer or seller and the patient' "); *Willett v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1098 (5th Cir.1991)("With regard to prescription drugs and medical products such as these heart valves, Louisiana follows the learned intermediary doctrine"); *Porterfield v. Ethicon, Inc.,* 183 F.3d 464, 468 (5th Cir.1999)("The learned intermediary doctrine applies in medical products liability actions in Texas"); *Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142,

---

**9.** In *Buckner v. Allergan Pharms.,* 400 So.2d 820 (Fla. 5th DCA 1981), the Fifth District Court of Appeal's opinion included dicta to suggest that the doctrine applied to prescrip-tion products in a broader sense than simply drugs; however, the case involved the use of prescription drugs.

1147–48 (D.Or.1989)(applying learned intermediary doctrine to an intrauterine device); *Spychala v. G.D. Searle & Co.*, 705 F.Supp. 1024, 1031–32 (D.N.J.1988) (same); *Hill v. Searle Laboratories*, 686 F.Supp. 720, 725 (E.D.Ark.1988) (same); *Lacy v. G.D. Searle & Co.*, 1988 WL 67825, 1988 Del.Super. LEXIS 205, 1988 WL 67825 (Del.Super.Ct.1988) (same); *McKee v. Moore*, 648 P.2d 21, 23–25 (Okla.1982) (same); *Terhune v. A.H. Robins Co.*, 90 Wash.2d 9, 577 P.2d 975, 977–79 (1978) (same); *Phelps v. Sherwood Medical Industries*, 836 F.2d 296, 303 (7th Cir.1987) (cardiac catheter); *Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670, 671 (8th Cir.1985) (x-ray); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1231–32 (4th Cir.1984) (pacemaker); *Perfetti v. McGhan Medical*, 99 N.M. 645, 662 P.2d 646, 650 (N.M.App.), cert. denied, 99 N.M. 644, 662 P.2d 645 (1983) (mammary prosthesis).

■ The rationale behind the doctrine is that patients do not have access to prescription medicines without the intervention of the learned intermediary; the manufacture therefore has no duty to warn the patient him or herself. Given that rationale, it makes even more sense to apply the doctrine in the context of medical devices. While some individuals could conceivably gain access to prescription drugs without their doctor's assistance, it is not reasonably conceivable that an individual could obtain and implant a device that requires a trained surgeon without the intervention of a physician. Moreover, it is highly likely a patient and doctor spend considerably more time discussing the risks and benefits of a surgically implanted device than they would discussing the risks and benefits of routinely prescribed prescription drugs. I agree with our sister Florida district courts, and with the great weight of authority to conclude that under Florida law, the learned intermediary doctrine applies to prescription medical devices as well as prescription drugs.[10]

### 3. The Adequacy of the Warning

Under the learned intermediary doctrine, the manufacturer's duty to warn runs to the physician, not to the patient. The question, then, is whether the warning provided to the physician is adequate. In this case, the package insert contains the following warnings, among others:

> The advancement of total and unicondylar knee joint replacement has provided the surgeon with a means of restoring mobility and reducing pain for many patients. While these devices are generally successful in attaining these goals they cannot be expected to withstand the activity levels and loads of normal healthy bone and joint tissue.

> Patient selection factors to be considered include: 1) need to obtain pain relief and improve function, 2) ability and willingness of the patient to follow instructions, including control of weight

---

**10.** This case is before this Court on diversity grounds; therefore, Florida substantive law applies to Plaintiffs' liability claims. Neither the Florida Supreme Court nor any intermediate Florida courts have opined on the issue of whether prescription medical devices fall within the learned intermediary doctrine. In accordance with Eleventh Circuit procedures, absent such decisions from the state courts, I must determine what the Florida Supreme Court would most likely do under the circumstances. *Fritz v. Standard Sec. Life Ins. Co.*, 676 F.2d 1356, 1358 (11th Cir.1982)("In the absence of controlling state precedent, we must discern how the Florida Supreme Court would rule if presented with the issue"); *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 214 (5th Cir.1980)("Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court must follow state law in a diversity case. Where no state court has decided the issue a federal court must 'make an educated guess as to how that state's supreme court would rule' ").

and activity level, 3) a good nutritional state of the patient, and 4) the patient must have reached full skeletal maturity. Excessive activity, failure to control body weight, and trauma affecting the joint implant replacement have been implicated with premature failure of the reconstruction by loosening, fracture, and/or wear of the prosthetic implants. Improper selection, placement, positioning, alignment and fixation of the implant components may result in unusual stress conditions which may lead to subsequent reduction in the service life of the prosthetic components.

The patient is to be warned that the device does not replace normal healthy bone and that the device can break or be damaged as a result of strenuous activity or trauma.

Caution: Federal law (USA) restricts this device to sale by or on the order of a physician.

■ Plaintiffs contend that they were both improper candidates for the device: one due to his activity level; the other due to his weight.[11] Given the clear and unambiguous nature of the warnings on the package insert, I conclude that the warnings are adequate as a matter of law. *See Felix v. Hoffmann–LaRoche, Inc.*, 540 So.2d 102 (Fla.1989)(holding that where warnings are accurate, clear, and unambiguous, the adequacy of the warning may be a question of law, rather than a question of fact).

In *Upjohn Co. v. MacMurdo*, 562 So.2d 680 (Fla.1990), the Florida Supreme Court explained that, as a general rule, expert testimony is required to determine the adequacy of a warning; however, in more obvious situations, expert testimony is not

required. The court cited *Wyeth Laboratories, Inc. v. Fortenberry*, 530 So.2d 688 (Miss.1988), and *Dion v. Graduate Hospital of University of Pennsylvania*, 360 Pa.Super. 416, 520 A.2d 876, 881 (1987) in support. In *Fortenberry*, the Mississippi Supreme Court explained the conditions under which expert testimony may or may not be needed to determine whether a warning is adequate. The court reasoned:

The adequacy of a warning addressed to the medical community may fall into the category of issues requiring expert testimony. "Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect." *Reyes*, 498 F.2d at 1276. "The terms and applications of a warning on such a drug, in order to have meaning, must be explained to the jury. This is a subject 'so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *Dion v. Graduate Hospital of the Univ. of Pennsylvania*, 360 Pa.Super. 416, 520 A.2d 876, 881 (1987) citing McCormick on Evidence 33 (E.Cleary, 3rd ed.1984). Where the adequacy of the warning is not obvious to the ordinary layperson it is necessary to have expert testimony as to this issue.

*Id.* at 692. The Pennsylvania Superior Court similarly opined that, in certain complex cases, expert testimony will be necessary to establish the adequacy of a warning to a physician. The court noted, however, that:

We caution that our holding here is limited to those cases in which the meaning of the warning eludes the comprehension of an ordinary layperson. Where any layperson can understand the insuf-

---

11. In their response to Biomet's motion for summary judgment, Plaintiffs claim that they have alleged that the device is defective in and of itself. However, throughout the course of this litigation they have acknowl-

edged that the product is appropriate for some patients; it simply was not appropriate for them. The Plaintiffs cannot maintain a strict liability defective product claim based upon those allegations.

ficiency of a warning, expert testimony is not necessary. It is for the trial court to limit this requirement to the bounds of necessity.

*Dion v. Graduate Hospital of University of Pennsylvania,* 360 Pa.Super. 416, 520 A.2d 876, 881 (1987).

In this case, the warnings are not beyond the ken of the average layperson, and do not require expert testimony in order to be understood. The warnings clearly indicate that weight control is important, as is decreased activity. Dr. Diaz, reading that warning, was on notice that obese or extremely active patients would not be proper candidates for the device.

Notably, Plaintiffs here did not provide any evidence that the warnings were, in themselves, inadequate. Plaintiffs did not provide any expert affidavits stating that the warnings were inadequate, and failed to refute the testimony of Dr. Diaz that he was well aware of the risks associated with the device. Nor did they refute the fact that the warnings clearly establish the factors applicable to themselves regarding weight and activity levels. Reviewing all of the evidence in the record, Plaintiffs have failed to raise a genuine issue of fact as to the adequacy of the warnings, and I conclude that as it pertains to the Plaintiffs in this case, the warnings were adequate as a matter of law.

### 4. Whether Dr. Diaz Was a Learned Intermediary

■ In this case, there is no question that Dr. Diaz was well versed in the use of the device, and entirely aware of the associated risks. Dr. Diaz performed over 700 surgeries implanting the device. Dr. Diaz testified that he knew that his patients might experience no improvement in their knee function after having the device implanted; that his patients would not be able to engage in impact sports, and might not be able to engage in non-impact activi-

ties; that his patients might not obtain the pain relief the hoped for; that his patients could not withstand the activity level of a person with healthy bone and tissue, and that excessive physical activity and trauma could cause the device to fail, break apart, or wear out; that a patient's excessive weight could cause the device to fail, break apart, or wear out; that if a component of the device failed or broke apart, it could cause further damage to the patient's knee; that his patients might need to have the device replaced in the future, and that they were merely postponing total knee replacement. While there is some dispute as to whether Dr. Diaz informed the Plaintiffs of all of these risks, that fact is irrelevant in this analysis. Under Florida law, it does not matter whether the physician passes the information on to his patients. *E.R. Squibb & Sons v. Farnes,* 697 So.2d 825, 827 (Fla.1997)("[w]hether the physician in fact reads the warning, or passes its contents along to the recipient of the drug is irrelevant").

■ Plaintiffs do not contend that Dr. Diaz was not abundantly experienced or that he was not well qualified to perform the surgeries and to select appropriate candidates for the device. They contend, however, that Dr. Diaz was misled by Biomet into believing that the product worked better than it actually did. However, Plaintiffs have not substantiated this assertion with any evidence in the record to create an issue of material fact as to whether Dr. Diaz was so misled. Dr. Diaz testified at deposition that his decisions as to patient selection were based upon his years of experience as a joint-replacement surgeon, and his research into the various types of replacement joints available on the market. Dr. Diaz specifically testified that none of Biomet's marketing materials influenced his decisions in any fashion, and Plaintiffs are unable to refute that testimony. Nor have Plaintiffs shown any evidence of collusion between Dr. Diaz and

Biomet, or that he made a greater profit by using Biomet's device rather than another type of replacement knee. Plaintiffs have simply not presented any evidence to suggest that Dr. Diaz was influenced by Biomet in any fashion in his decisions to use the device in his patients.

Plaintiffs further suggest that Dr. Diaz may have been influenced by Biomet without his knowledge. Plaintiffs claim that some of the articles read by Dr. Diaz had been sponsored by Biomet, and that the sponsorship was not disclosed. This lack of disclosure, argue Plaintiffs, could have caused Dr. Diaz to be misled by Biomet without him realizing the source of the influence. This assertion is mere conjecture and speculation; it has no basis in fact. The Plaintiffs have provided no proof that such a scenario occurred, they merely suggest that it might have. Speculation and hypothesizing will not suffice to create a genuine issue of fact, and Plaintiffs have not established any genuine issue of fact here.

Dr. Diaz's actual knowledge of the risks of the device clearly establishes his role as a learned intermediary under applicable Florida and Eleventh Circuit law. *See, e.g., Ellis v. C.R. Bard, Inc.,* 311 F.3d 1272 (11th Cir.2002)(holding that where hospital staff was aware of the danger in persons other than the patient activating a morphine pump, the manufacturer of the pump had no duty to warn the patients, and the learned intermediary doctrine applied); *Baker v. Danek Medical,* 35 F.Supp.2d 875 (N.D.Fla.1998)(holding that where physician knew the risks of using a pedicle screw in bone surgery, the manufacturer of the screw was insulated from a failure to warn claim); *Felix v. Hoffmann–La-Roche, Inc.,* 540 So.2d 102 (Fla.1989)(holding that where physician was aware of the dangers of teratogenic effects of a drug, the learned intermediary doctrine barred patient's claim against drug manufacturer).

The Eleventh Circuit has recognized that, "regardless of the sufficiency or insufficiency of the warnings at issue ... [w]here a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that the learned intermediary doctrine applies or that the causal link is broken and the plaintiff cannot recover." *Ellis,* 311 F.3d at 1283 n. 8. Because Dr. Diaz has testified without contradiction that he was aware of all the risks associated with the device, and that he believed-and still believes-that the Plaintiffs were appropriate candidates for the device, the learned intermediary doctrine applies, and the causal link is broken. The undisputed facts regarding Dr. Diaz's knowledge of the risks of the device mandate that, as a matter of law, the learned intermediary doctrine bars Plaintiffs' claims against Biomet.

## B. Exceptions to the Learned Intermediary Doctrine

Plaintiffs attempt to avoid the impact of the learned intermediary doctrine in several ways. First, they argue that even if the doctrine bars their claims for negligence and strict products liability, their FDUTPA and negligent misrepresentation claims survive. They further argue that the direct to consumer marketing exception or the overpromotion exception applies. I will address each in turn.

### 1. Application of the Learned Intermediary Doctrine to the FDUTPA and Negligence Misrepresentation Claims

#### a. Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)

Florida Statutes §§ 501.201–.213, the FDUTPA, is intended to "protect the con-

suming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2nd DCA 2006). A deceptive practice is one that is "likely to mislead" consumers. *Davis v. Powertel, Inc.,* 776 So.2d 971, 974 (Fla. 1st DCA 2000). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers'" *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So.2d 489, 499 (Fla. 4th DCA 2001).

Plaintiffs allege that Biomet violated FDUTPA in that its advertising campaign made the product appear to be better than it was, and applicable to more patients that it actually was. Biomet argues that Plaintiffs are simply dressing up their failure to warn claim in another package, in attempt to get around the learned intermediary doctrine.

No Florida state court case has addressed the issue of a FDUTPA claim relating to a prescription medical product. However, federal courts in jurisdictions across the country, including Florida, have held that the learned intermediary doctrine encompasses all claims based upon a pharmaceutical manufacturer's failure to warn, including claims for fraud, misrepresentation, and violation of state consumer protection laws. In *Edgar v. Danek Med., Inc.,* 1999 WL 1054864 (M.D.Fla. March 31, 1999) and *Alexander v. Danek Med., Inc.,* 37 F.Supp.2d 1346 (M.D.Fla.1999), the District Court for the Middle District of Florida held that the learned intermediary doctrine precluded negligence, strict liability and fraud claims based upon underlying failure to warn of risks related to "off-label" use of pedicle screws.

Other district courts have found that the learned intermediary doctrine applied to claims including state deceptive and unfair trade practices laws. *See Doe v. Solvay Pharms., Inc.,* 350 F.Supp.2d 257, 274 n. 12 (D.Maine 2004)(applying learned intermediary doctrine and granting summary judgment on plaintiff's deceptive trade practices act, unfair trade practices act, strict liability, failure to warn and fraudulent misrepresentation claims because each of those claims was based upon defendants' alleged failure to warn); *Catlett v. Wyeth, Inc.,* 379 F.Supp.2d 1374, 1381 (M.D.Ga.2004) ("learned intermediary rule" encompasses any fraud, fraudulent concealment, misrepresentation, failure to warn or breach of warranty claims related to the sale and use of prescription drugs); *Huntman v. Danek Med., Inc.,* 1998 WL 663362 (S.D.Cal. July 24, 1998) (same);

One district court explained the rationale behind these decisions in *In re Norplant Contraceptive Products Liability Litigation,* 955 F.Supp. 700 (E.D.Tex. 1997). In that case, plaintiffs brought causes of action for strict liability, negligence, misrepresentation, implied warranty and violation of the Texas Deceptive Trade Practices Act (DTPA) based upon injuries they claimed they suffered as a result of using the contraceptive Norplant. *Id.* at 702–03. Defendant argued that summary judgment in its favor was warranted because plaintiffs' claims were barred by the learned intermediary doctrine. *Id.* at 709. The district court considered the scope of the doctrine and determined that the gravamen of all of the plaintiffs' causes of action, including misrepresentation and violation of the DTPA was that the defendant failed to adequately warn of or disclose the severity of Norplant's side effects. *Id.* The court thus held that "the learned intermediary doc-

trine applies to all of Plaintiffs' causes of action." *Id.* The court reasoned:

> [W]hether the failure to warn is couched as an affirmative misrepresentation or a misrepresentation by concealment, the allegation collapses into a charge that the drug manufacturer failed to warn. If the doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action such as violation of the DTPA or a claim for misrepresentation, then the doctrine would be rendered meaningless. Therefore, this summary judgment motion, based upon application of the learned intermediary doctrine, is dispositive of all of Plaintiffs' claims.

*Id.*

■ The same result is warranted here. While Plaintiffs have provided various names for their claims against Biomet, the claims are all ultimately based upon Biomet's alleged failure to warn of the risks of the device. Because Florida has adopted the learned intermediary doctrine, I conclude that it would follow the reasoning above and hold that the doctrine bars the Plaintiffs' claims in this case.

Moreover, Plaintiffs' claim of deceptive advertising fails on the undisputed facts. A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2nd DCA 2006). Plaintiffs point to Biomet's website and brochures as the source of the deceptive advertising. However, a review of the information on the website and the brochure reveal that each of Plaintiffs' claims of deceptive advertising are belied by the information itself. For instance, Plaintiffs claim that they believed that the use of this device would prevent the need for a total knee replacement. They also claim that they were misinformed regarding their need to control weight or moderate their activity levels. Yet the brochure, in its question and answer section, states:

> Q. How long can I expect this prosthesis to last?
>
> A. All implants have a limited life expectancy, depending on several factors including a patient's weight, activity level, quality of bone stock and willingness to follow the surgeon's instructions. The great advantage of the this implant is that only 1/4″ of the bone is removed for fitting purposes. The implant can be replaced or followed by other techniques, such as total joint replacement, if necessary, in the future.
>
> Q. My symptoms and x-rays fit the criterion for this procedure, however, I have been advised to wait until my knee is completely destroyed and then have a total knee replacement.
>
> A. Differences of opinion exist in treating knee arthritis. In total knee replacement, the entire knee joint is replaced with metal and plastic. Knee reconstruction with Repicci II implants is a conservative approach designed to aid in preserving functional knee tissue, in hopes of providing relief before a total knee replacement becomes necessary, or altogether avoiding the necessity for future total knee replacement.

The website also contains the following information:

> Only about 1/4″ of bone on one compartment of the knee is removed to properly fit Repicci II implants. In total knee replacement all knee surfaces lose up to 1/2″ of bone on each of the three compartments. Since Repicci II implants preserve bone, future total knee replacement procedures may be easily performed, if necessary.

■ The information contained in both the brochure and the website is clear; fu-

ture total knee replacement may be necessary in patients who undergo partial knee replacement. For Plaintiffs to claim that Biomet's advertising materials lead them astray on this point is unavailing. The brochure-which is the main focus of Plaintiffs' deceptive advertising claims-is equally clear as to a patient's need to control weight and to moderate activity. Again, Plaintiffs cannot reasonably claim that such clear and unambiguous statements were deceiving.

The evidence Plaintiffs have set forth to demonstrate deceptive advertising practices has the opposite effect; it shows that the literature makes clear those very things that Plaintiffs complain were deceiving. Accordingly, Plaintiffs have failed to raise an issue of material fact that Biomet violated FDUTPA in any fashion.[12]

#### b. Negligent Misrepresentation

Plaintiffs also claim that Biomet negligently misrepresented the virtues of the device, and failed to disclose its risks. As discussed above, many federal courts have held that the learned intermediary doctrine shields the manufacturer of a prescription medical device from a negligent misrepresentation claim, as the claim is, in reality, a failure to warn claim. However, no Florida court has addressed the issue. Nonetheless, Plaintiffs fail to state a claim

of negligent misrepresentation as a matter of law.

■ To succeed in a claim for negligent misrepresentation under Florida law, a plaintiff must demonstrate that:

(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false;

(2) the defendant was negligent in making the statement because he should have known the representation was false;

(3) the defendant intended to induce the plaintiff to rely ... on the misrepresentation; and

(4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.

*Romo v. Amedex Ins. Co.*, 930 So.2d 643, 653 (Fla. 3rd DCA 2006).

■ A key element of such a claim, clearly, is a misrepresentation of a material fact. As discussed above, Plaintiffs have failed to identify a single false or misleading statement in the advertising brochure or on Biomet's website. They have therefore failed to establish the first requisite prong of a claim for negligent misrepresentation. If the Plaintiffs, after reading Biomet's brochure, believed that the device would prevent the need a total knee replacement, Biomet is not to blame for that misapprehension. While the bro-

---

12. Additionally, Plaintiffs' claims in this case are problematic in terms of damages available under FDUTPA. The standard for determining the actual damages recoverable under FDUTPA is well-defined in the case law: "[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. [...] A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages." *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984). For purposes of recovery under FDUTPA, "actual damages" do not include consequential damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2nd DCA 2006). Plaintiffs' damage claims in this case go far beyond the value of the knee replacement device, or even the cost of the surgical procedure. Under FDUTPA, Plaintiffs would not be eligible for consequential damages including such things as pain and suffering, lost wages, or the cost of the subsequent total knee replacement.

chure and website contain information about the benefits of the device, they also contain information regarding the very risks complained of by Plaintiffs.

Viewing all of the evidence in the record in the light most favorable to the Plaintiffs, they have failed to raise an issue of material fact so as to preclude summary judgment on their claim for negligent misrepresentation.

## 2. The Direct to Consumer Advertising Exception

Plaintiffs correctly point out that one court has recognized an exception to the learned intermediary doctrine in the form of a direct to consumer advertising exception (DTC). In *Perez v. Wyeth Laboratories, Inc.*, 161 N.J. 1, 734 A.2d 1245 (1999), the court found that where a drug company marketed its product directly to consumers via broadcast and print media, the learned intermediary doctrine did not shield the manufacturer from liability. In *Perez*, the court discussed the changes in marketing efforts by drug manufacturers in recent years:

Among the most controversial of the new marketing techniques employed by pharmaceutical manufacturers is direct-to-consumer prescription advertising in a variety of formats and media. Pharmaceutical remedies for varied problems such as allergies, nail fungus, hypertension, hair loss, and depression are placed directly before the consumer in magazines, television, and via the Internet. The utilization of direct consumer marketing raises questions and issues addressing manufacturer liability for failure to adequately warn of risks possibly associated with pharmaceutical use.

The American Medical Association (AMA) has long maintained a policy in opposition to product-specific prescription ads aimed at consumers. A 1992

study by the Annals of Internal Medicine reports that a peer review of 109 prescription ads found 92 per cent of the advertisements lacking in some manner. [Michael C. Allen, Medicine Goes Madison Avenue: An Evaluation of the Effect of Direct–to–Consumer Pharmaceutical Advertising on the Learned Intermediary Doctrine, 20 Campbell L.Rev. 113, 113–116 (1997) (footnotes omitted).]

The difficulties that accompany this [type of advertising] practice are manifest. "The marketing gimmick used by the drug manufacturer often provides the consumer with a diluted variation of the risks associated with the drug product." Even without such manipulation, "[t]elevision spots lasting 30 or 60 seconds are not conducive to 'fair balance' [in presentation of risks]." Given such constraints, pharmaceutical ads often contain warnings of a general nature. However, "[r]esearch indicates that general warnings (for example, see your doctor) in [direct-to-consumer] advertisements do not give the consumer a sufficient understanding of the risks inherent in product use." Consumers often interpret such warnings as a "general reassurance" that their condition can be treated, rather than as a requirement that "specific vigilance" is needed to protect them from product risks.

*Id.* at 13–14, 734 A.2d 1245, citing Jon D. Hanson & Douglas A. Kysar, Taking Behavioralism Seriously: Some Evidence of Market Manipulation, 112 Harv. L.Rev. 1420, 1456 (1999).

Based upon these changes, the *Perez* court determined that "[c]onsumer-directed advertising of pharmaceuticals thus belies each of the premises on which the learned intermediary doctrine rests." *Id.* at 19, 734 A.2d 1245. The court cited the reasoning found in Susan A. Casey, Com-

ment, Laying an Old Doctrine to Rest: Challenging the Wisdom of the Learned Intermediary Doctrine, 19 Wm. Mitchell L.Rev. 931, 956 (1993), in support of its decision:

> First, the fact that manufacturers are advertising their drugs and devices to consumers suggests that consumers are active participants in their health care decisions, invalidating the concept that it is the doctor, not the patient, who decides whether a drug or device should be used. Second, it is illogical that requiring manufacturers to provide direct warnings to a consumer will undermine the patient-physician relationship, when, by its very nature, consumer-directed advertising encroaches on that relationship by encouraging consumers to ask for advertised products by name. Finally, consumer-directed advertising rebuts the notion that prescription drugs and devices and their potential adverse effects are too complex to be effectively communicated to lay consumers. Because the FDA requires that prescription drug and device advertising carry warnings, the consumer may reasonably presume that the advertiser guarantees the adequacy of its warnings. Thus, the common law duty to warn the ultimate consumer should apply.

Since *Perez* was decided, no court-including any Florida court-has recognized the DTC exception to the learned intermediary doctrine, and several courts have expressly rejected the DTC exception. In *Colacicco v. Apotex, Inc.*, 432 F.Supp.2d 514, 547 n. 30 (E.D.Pa.2006), while not deciding the issue because of other grounds, the District Court for the Eastern District of Pennsylvania explained that

> [i]f we reached the merits of the LID issue, any direct-to-consumer ("DTC") advertising exception would likely not apply. This is because, in the eight

years since Perez, the New Jersey Supreme Court case making an exception to the LID for direct-to-consumer advertising, was decided, no state has joined New Jersey.... Thus, absent an intervening change in the applicable law, in this Court's view, Pennsylvania law does not provide any exception to the LID based on direct-to-consumer advertising.

Similarly in *In re Meridia Prods. Liab. Litig.*, 328 F.Supp.2d 791, 812 n. 19 (N.D.Ohio 2004), the court declined to find an exception to the learned intermediary doctrine:

> Plaintiffs encourage this Court to apply the Perez court's reasoning to all plaintiffs' claims. Although the Perez opinion is certainly well-reasoned, plaintiffs' argument poses a major federalism problem. This Court is a federal court with jurisdiction over plaintiffs' claims based on diversity of citizenship. As such, it must apply the law of each state, or where a state's law is silent on a particular issue, its prediction of what that state's supreme court would hold. Five years have passed since the New Jersey Supreme Court decided Perez. In the intervening period, no other state has followed New Jersey's lead. The Court thus could not apply Perez's logic even if it desired to do so.

 I agree with the reasoning by the Northern District of Ohio. While the *Perez* court found that the law should be changing in response to changes in marketing strategies by drug manufacturers, New Jersey is the only state to have done so. It is now eight years since Perez was decided, and no other state has followed suit. Given Florida's longstanding recognition of the learned intermediary doctrine, I conclude that it would be unlikely that the Florida Supreme Court would rec-

ognize the DTC exception. I therefore decline to create such an exception here.

### 3. Overpromotion

Plaintiffs argue that the overpromotion of a product negates any warnings, and creates an exception to the learned intermediary doctrine. Plaintiffs correctly point out that numerous courts have recognized overpromotion as an exception to the doctrine, citing numerous cases in support of that position. I first point out that, as with the DTC exception, no Florida court has recognized the overpromotion exception to the learned intermediary doctrine. Moreover, the cases cited by Plaintiffs are factually distinguishable from the case at hand.

The majority of the cases cited by Plaintiffs involved the use of a wide-spectrum antibiotic known as Chloromycetin, which caused a plastic amenia in numerous patients, resulting in severe injuries.[13] *Love v. Wolf,* 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (Cal.Ct.App.1964); *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (Cal.1973); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359 (4th Cir.1975); *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971).[14] In each of these cases, the courts found that the drugs were overpromoted by salesmen known as "detail men," who visited physicians' offices and encouraged physicians to prescribe the drug. During these visits, the detail men often provided information regarding the drug which contradicted the warnings on the package insert of the drug, and made the drug appear much safer than it actually was. The physicians prescribing the drug testified that they were influenced by the representations of the detail men, and prescribed the drug much more freely than they would have without those representations.

 There are no comparable undisputed issues of fact in this case. There were no detail men from Biomet visiting Dr. Diaz, and encouraging him to use the device. There is no evidence whatsoever that Biomet represented to Dr. Diaz that the device was more safe than it actually was. Dr. Diaz has testified that he was not influenced by any representations from Biomet concerning proper patient selection. As noted in one of the cases cited by Plaintiffs,

> Of course, if such overprescription by the doctor was not caused by the overpromotion of Parke–Davis then, however negligent such overpromotion may have been, Parke–Davis could not be held liable. Its negligence would not have been an inducing, or proximate, cause of the resulting injuries. Dr. Wolf's negligence would have been an intervening, independent, and solely proximate cause.

*Love v. Wolf,* 226 Cal.App.2d 378, 399–400, 38 Cal.Rptr. 183 (Cal.Ct.App.1964). There is simply no evidence offered by Plaintiffs on summary judgment that Dr. Diaz was influenced by any of Biomet's marketing

**13.** Plaintiffs also cite *Smith v. Pfizer,* 2000 WL 1679483 (D.Kan.2000), and *Ohler v. Purdue Pharma, L.P.,* 2002 WL 88945 (E.D.La.2002). In *Smith,* the issue was whether the plaintiff was entitled to certain discovery as it wanted to explore the theory of overpromotion. The court made no finding as to whether overpromotion existed under the facts of the case. In *Ohler,* the court's inquiry concerned jurisdiction and preemption. The court merely noted that some courts have found that an overpro-

motion exception to the learned intermediary doctrine may apply.

**14.** *Baldino v. Castagna,* 308 Pa.Super. 506, 454 A.2d 1012 (1983) is a comparable case involving the drug Butazolidin, rather than Chloromycetin. In this case, the evidence made clear that the detail men had influenced the doctor, such that the doctor overprescribed the drug.

**1378**

materials to induce him to inappropriately select patients for the device. Dr. Diaz used his considerable experience-implanting more than 10,000 joint replacements in his career-and independent research and judgment in making his patient selection decisions. Thus, Plaintiffs have failed to raise a genuine issue of fact to support their position that the overpromotion exception should apply in this case; therefore, the learned intermediary doctrine shields Biomet from liability.

## C. Conflicting Evidence between Plaintiffs' Complaints and Affidavits

In addition to its arguments regarding the learned intermediary doctrine, Biomet argues that statements made in Plaintiff Beale's affidavit-the only affidavit in the record-are in direct contradiction to the allegations of the Complaints, and that the affidavit defeats those allegations.

Although Plaintiffs' original and amended Complaints focused on the fact that they were not appropriate candidates for the device, in their opposition to summary judgment and at oral argument the Plaintiffs focused largely on the fact that they were misled into believing that the device would prevent the need for a total knee replacement. However, certain statements in Beale's affidavit are contrary to that assertion. For example, Beale's affidavit states that:

> She [Jill Pfendler, Dr. Diaz's assistant] also said the surgery would be in lieu of a total knee replacement and would prolong the time if I ever did need a total knee replacement. It would extend the time of getting a total knee replacement surgery if needed at all.

The affidavit also states that:

> After going to the presentation with Jill Pfendler, reviewing the Biomet brochure I received at the presentation and meet-

ing with Dr. Diaz, I thought it would be great to have this. I would be alive longer without the pain. I got the impression this would put off the need for a total knee replacement.

Clearly, the affidavit reveals that Beale was aware of the possibility of the need for a total knee replacement in the future. He cannot now argue against his own sworn statements. Viewing the facts in the record in the light most favorable to the Plaintiffs, I conclude that Plaintiffs have failed to raise any genuine issue of material fact to demonstrate that they were misled by Biomet. Accordingly, Plaintiffs' claims against Biomet must fail as a matter of law.

## IV. Conclusion

The learned intermediary doctrine is firmly established under Florida law, and no Florida courts have recognized the exceptions urged by Plaintiffs. Viewing all undisputed facts in the light most favorable to Plaintiffs, the learned intermediary doctrine insulates Biomet from this lawsuit as a matter of law. Moreover, Plaintiffs have failed to present any misleading statements made by Biomet to sustain a claim for violation of FDUTPA or negligent misrepresentation. Summary judgment must therefore be granted in favor of Biomet as to all of Plaintiffs' claims.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. Biomet's Motion for Summary Judgment **[DE 103] is GRANTED.**

2. Plaintiffs' Complaint is dismissed with prejudice.

3. This case is closed.

4. All pending motions are denied as moot.