Kay PATTESON, et al., Plaintiffs,

v.

ASTRAZENECA, LP, et al., Defendants.

Civil Action No. 10–1760 (JEB).

United States District Court, District of Columbia.

July 9, 2012.

Kenneth M. Trombly, Schultz & Trombly, PLLC, Washington, DC, Timothy J.

Aiken, Aiken & Scoptur, S.C., Milwaukee, WI, for Plaintiffs.

Earl B. Austin, Melissa Armstrong, Baker & Botts, L.L.P., New York, NY, Aaron Davidson, Baker & Botts, L.L.P., Dallas, TX, Jennifer E. Owens, Baker Botts, LLP, Washington, DC, Gregory Samuel McKee, Wharton, Levin, Ehrmantraut & Klein, PA, Annapolis, MD, for Defendants.

## MEMORANDUM OPINION

JAMES E. BOASBERG, District Judge.

Plaintiff Kay Patteson first consulted Dr. John Maloney in May 2006, complaining of anxiety, depression, chronic insomnia, and serious alcohol abuse and dependence. Having evaluated Patteson's symptoms, Maloney began prescribing Seroquel—a second-generation antipsychotic drug manufactured by Defendant AstraZeneca—to treat her insomnia. Maloney prescribed Seroquel "off label," as it had not been approved by the Food and Drug Administration for insomnia. Patteson's condition improved while she was on the drug; within a year, however, she began experiencing trouble walking and muscle spasms. Patteson consulted with Maloney and a number of other physicians to determine the cause of her symptoms. For many months, her doctors struggled to come up with a diagnosis, and it was not until January of 2008 that she was ultimately found to have tardive dyskinesia, a movement disorder linked to her Seroquel use.

Patteson and her husband filed this suit in September 2010 asserting nine claims against Maloney and AstraZeneca based on their failure to warn her of the risks associated with Seroquel. Both Defendants have now separately moved for summary judgment. Because the Court finds that AstraZeneca's duty to warn runs to the physician—and not to Ms. Patteson—it will grant AstraZeneca's Motion, dismissing all claims against the drug's manufacturer. The Court, however, will deny Maloney's Motion, which rests exclusively on a statute-of-limitations argument, as it finds that Plaintiffs have shown that their claims were timely filed under the continuing-treatment and discovery rules.

## I. Background

Looking at the evidence in the light most favorable to Plaintiffs, as the Court must do here, Maloney first began treating Ms. Patteson on or about May 30, 2006. *See* Maloney Statement of Undisputed Facts (Maloney SUF), ¶ 2. In her initial visit to Maloney, she complained of "depression, anxiousness, chronic insomnia, and serious alcohol abuse/dependence," *id.*, ¶ 3, and Maloney diagnosed her with "depression, anxiety, and alcohol dependence." *Id.*, ¶ 4. Additionally, Patteson complained of difficulty sleeping. *See* AstraZeneca Statement of Undisputed Facts (AstraZeneca SUF), ¶ 11. Maloney initially prescribed Trazodone to attempt to address her insomnia; however, the drug did not improve her symptoms, and Maloney then switched her to a low dose of Seroquel. *See id.*, ¶ 12.

Seroquel, a second-generation antipsychotic manufactured by AstraZeneca, *see id.*, has been approved for the treatment of schizophrenia and bipolar mania, as well as bipolar depression, bipolar maintenance, and as an adjunctive therapy for major depressive disorder. *See id.*, ¶¶ 20–21. It has not been approved by the FDA, however, to treat insomnia. *See id.* Seroquel's FDA-approved label includes a variety of warnings, including a discrete section concerning the risk of tardive dyskinesia, a "syndrome of potentially irreversible, involuntary, dyskinetic movements." *See id.*, ¶¶ 22–23. Such warnings also ap-

peared in the Physician's Desk Reference, which Maloney "referred to as a source of information at the time he was treating Kay Patteson." *Id.*, ¶ 25.

Although Maloney was aware of the possibility that Seroquel carried a risk of tardive dyskinesia at the time he prescribed the drug to Patteson, *see id.*, ¶ 27, he nonetheless did so after considering multiple factors. *See id.*, ¶ 13; AstraZeneca Mot., Exh. 2 (Deposition of Dr. John Maloney) at 11:12–12:12 ("There was a ... multitude of factors that I consider in prescribing medication. I did a complete medical/psychiatric evaluation and she was complaining of a sleep disorder.... I ultimately did prescribe Seroquel in that context because of the nonaddictive properties of it.... That was the reason I chose that medicine.").

After she began taking Seroquel, Patteson reported to Maloney that her symptoms had improved. *See* AstraZeneca SUF, ¶¶ 14–15. In April 2007, however, approximately ten months after she began taking the drug, Patteson's general medical condition began to worsen. *See* Pls.' Statement of Material Facts in Genuine Dispute (Pls.' SMF), ¶ 14. She was admitted to the hospital on April 22, 2007, for progressive weakness in her lower extremities and difficulty walking. *See id.*, ¶ 16. In a visit with Maloney on June 5, 2007, Patteson discussed the symptoms she was experiencing. *See id.*, ¶ 19. She nonetheless continued to take Seroquel following this meeting. *See id.* Patteson consulted with Maloney over the course of that summer, as well as with a neurologist, Dr. Peter Bernad; however, neither physician could determine the cause of her symptoms. *See id.*, ¶¶ 17, 20–21.

On August 3, 2007, Patteson again discussed her difficulty walking with Maloney, as well as muscle spasms and weakness that she was experiencing, and

Maloney, accordingly, began to taper her dosage of Seroquel. *See id.*, ¶ 22. Maloney claims that he informed Patteson that he was reducing the dosage because there was a possibility that it could be contributing to her muscular problems. *See* Maloney SUF, ¶ 10. Patteson disputes this, claiming that Maloney informed her that he was reducing the dosage because "she had been on it for a long time and there was a possibility that it was aggravating her limp." Pls.' SMF, ¶ 22. Two days after this consultation, she met with Bernad and inquired as to whether her leg problems could be related to Seroquel. *See id.*, ¶¶ 24–25. Bernad told her that he was unsure and that her symptoms were most probably caused by the highly unusual stressors in her family life. *See id.*

Over the next few months, Patteson's doctors continued to grapple with her symptoms. *See id.*, ¶¶ 26–30. Potential causes ranged from the psychological to spinal-cord problems. *See id.* During an appointment on December 31, 2007, Maloney still told Patteson that he did not know what was causing her problems. *See id.*, ¶ 30. Patteson followed up with a different physician on January 17, 2008, and was told—for the first time—that she might have a condition known as tardive dyskinesia, which could be attributed to her long-term use of Seroquel. *See id.*, ¶¶ 31–32. The difficulties the professionals treating Patteson experienced in trying to diagnose her condition were due in part to the "profound stressors in her life," as well as the "highly atypical" presentation of the condition. *See id.*, ¶¶ 34–35. "Most patients with that condition have symptoms concentrated in the face, tongue, or eyelids, whereas Mrs. Patteson's symptoms were concentrated in the lower extremities." *Id.*, ¶ 35. Patteson was ultimately dis-

charged from Maloney's treatment on February 1, 2008. *See id.,* ¶ 40. She met with a neurologist several days later, who concluded that tardive dyskinesia was the most likely diagnosis. *See id.,* ¶ 39. Patteson and her husband filed a Complaint in the Superior Court of the District of Columbia on September 9, 2010, and Defendant AstraZeneca subsequently removed the matter to this Court. Both Defendants now separately move for summary judgment.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir.2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Holcomb,* 433 F.3d at 895; *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Holcomb,* 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R.Civ.P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers*

*Watchdog, Inc. v. Stanley,* 819 F.2d 294, 297 (D.C.Cir.1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Mastro v. PEPCO,* 447 F.3d 843, 850 (D.C.Cir.2006); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir. 1998) (*en banc.*) On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters,* 475 F.3d 360, 363 (D.C.Cir.2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. Analysis

While Plaintiffs set forth nine distinct claims in their Amended Complaint, *see* Am. Compl., ¶¶ 12–54, all of them "hinge on the tort theory of failure to warn, which is governed by a negligence standard." AstraZeneca Supp'l Reply at 1.[1] The Court's analysis of each Motion for Summary Judgment, therefore, applies equally

---

1. The Court dismissed Count V of Plaintiffs' Amended Complaint without prejudice on March 30, 2012, following Defendant AstraZeneca's ·Partial Motion for Summary Judgment and Plaintiffs' Non–Opposition to that Motion; as a result, only eight counts remain for purposes of these Motions.

to all counts for each Defendant—an approach that Plaintiffs do not dispute. Indeed, they filed no response to AstraZeneca's Supplemental Memorandum on this issue, though given the opportunity by the Court at the May 7, 2012, status hearing. The Court, accordingly, will evaluate in turn each Defendant's Motion.

Defendant AstraZeneca argues that Plaintiffs' suit against it is barred by the "learned intermediary doctrine," *see* AstraZeneca Mot. at 14–15, and, alternatively, by the statute of limitations. *See id.* at 15–19. As the Court finds that the learned-intermediary doctrine applies and that AstraZeneca has effectively discharged its duty to warn Maloney, it will grant its Motion without needing to address the statute of limitations.

Defendant Maloney's Motion, conversely, rests exclusively on a statute-of-limitations argument. *See* Maloney Mot. at 4–6. Because the continuing-treatment rule tolls the limitation period for filing suit until the doctor ceases to treat the patient in the specific matter, the Court finds that Plaintiffs' claims are timely filed. Furthermore, even if the continuing-treatment rule did not apply here, the Court finds that there are sufficient factual disputes surrounding the accrual of Plaintiffs' claims under the discovery rule that summary judgment is precluded.

The Court will, consequently, grant judgment to AstraZeneca and deny Maloney's Motion.

### A. *AstraZeneca*

AstraZeneca first argues that Plaintiffs' claims are barred by the "learned intermediary doctrine," which excuses a manufacturer from warning each patient who receives the drug where it has properly warned the prescribing physician of the dangerous propensities of its product. *See* AstraZeneca Mot. at 14–15. Plaintiffs do not dispute the existence of this doctrine here, but contend that it is unavailing both because Maloney did not know of the risks and because AstraZeneca's warnings were rendered ineffective by its "overpromotion" of Seroquel. *See* Opp. at 22–27.

 Within the context of product-liability cases involving prescription drugs, courts in this District applying District of Columbia law have employed the learned-intermediary doctrine, which alters the general rule that imposes liability on a manufacturer for failing to warn an end user of the known risks or hazards of its products. *See MacPherson v. Searle & Co.,* 775 F.Supp. 417, 422–23 (D.D.C.1991); *Brick v. Barnes–Hines Pharm. Co., Inc.,* 428 F.Supp. 496, 497–98 (D.D.C.1977) (tacitly applying District of Columbia law and recognizing learned-intermediary doctrine); *see also Payne v. Soft Sheen Prods., Inc.,* 486 A.2d 712, 722 n. 10 (D.C. 1985) (hair-care case recognizing learned-intermediary doctrine). The doctrine is premised on the fact that

> because prescription drugs are available to the public only through a physician and are to be administered only under a physician's supervision, the pharmaceutical manufacturer's duty is to adequately inform the physician, who is "expected to function as a 'learned intermediary' between the company and the patient in protecting the patient and in providing direct information about the drug to the patient."

*MacPherson,* 775 F.Supp. at 422–23 (quoting William J. Curran, Mark A. Hall & David H. Kaye, *Health Care Law, Forensic Science, and Public Policy* (4th ed.1990)).

 Other courts have explained some of the doctrine's contours in more detail. For example, the Eleventh Circuit

has held that a prescription drug manufacturer

> does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer. The rationale for the doctrine is that the treating physician is in a better position to warn the patient than the manufacturer, in that the decision to employ prescription medication . . . involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular need and susceptibilities.

*Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir.2010) (internal citations omitted) (applying Georgia law). A prescribing physician, "equipped with the knowledge imparted to him by the drug's manufacturer, determines, weighing benefit against risk, the drug's suitability for a particular patient." *See Walton v. Bayer Corp.*, 643 F.3d 994, 1000 (7th Cir.2011). As long as the drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product, the manufacturer is excused from warning each patient who receives the drug. If, however, " 'the warning to the intermediary is inadequate or misleading, the manufacturer remains liable for injuries sustained by the ultimate user.' " *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 276 (5th Cir.2010) (quoting *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 592 (Tex.1986)). An inadequate warning alone, however, is not enough; the learned-intermediary doctrine also requires that the inadequate warning be a "producing cause" of the plaintiff's injuries. *See McNeil v. Wyeth*, 462 F.3d 364, 372 (5th Cir.2006).

■ There can be little dispute that AstraZeneca satisfies the learned-intermediary doctrine here. It informed Maloney of the risks associated with Seroquel by providing him with an FDA—approved product label, which contained clear, unambiguous language about the drug and, specifically, the risk of tardive dyskinesia. *See* AstraZeneca SUF, ¶¶ 22–25. Plaintiffs attempt to contest this, asserting, "Dr. Maloney believed that Seroquel could not cause tardive dyskinesia." Pls.' SMF, ¶ 8. This assertion, however, is inconsistent with the record evidence to which Plaintiffs themselves direct the Court. For example, in selections from Maloney's deposition that Plaintiffs cite, the doctor testifies that "the risk[,] though present[,] was really very low," Opp., Exh. 5 (Maloney Dep.) at 69:13, and later, he again discusses the risk of neuromuscular problems, including tardive dyskinesia, with Seroquel as "[r]are or infrequent." *Id.* at 72:9–12. While Maloney may have understood that the risk was low, he clearly understood that it nonetheless existed. *See also id.* at 176:17–177:9 (stating that, while second-generation antipsychotics are understood to carry lower risk of movement disorders, risk was not zero, and there was at least a possibility that a drug like Seroquel could cause tardive dyskinesia). As the record unequivocally demonstrates that AstraZeneca expressly and clearly warned Maloney about the risk of tardive dyskinesia—and that Maloney was in fact aware of this risk—AstraZeneca has satisfied its duty to warn Patteson's physician.

■ In addition to challenging Maloney's understanding of the warning, Plaintiffs further argue that AstraZeneca should not be permitted to invoke the learned-intermediary doctrine where the drug manufacturer has "overpromoted" the drug and "erode[d] the effectiveness of otherwise adequate warnings," Opp. at 23, through its "aggressive marketing tactics."

*See* Pls.' SMF, ¶¶ 1–2. In jurisdictions recognizing this exception, the " 'overpromotion of a product negates any warnings,' " such that a manufacturer of the product cannot avail itself of the doctrine. *Dean v. Eli Lilly & Co.,* 387 Fed.Appx. 28, 30 (2d Cir.2010) (quoting *Beale v. Biomet, Inc.,* 492 F.Supp.2d 1360, 1377 (S.D.Fla. 2007)); *see also In re Zyprexa Prods. Liab. Litig.,* No. 04–1596, 2009 WL 2004540, at *14 (E.D.N.Y. July 1, 2009) ("In unusual cases, courts have found a drug manufacturer's excessive promotion of its product may negate or call into question operation of the learned intermediary doctrine.").

 "A plaintiff arguing in favor of application of the overpromotion exception with respect to a prescription drug must establish with individualized proof that such overpromotion caused the physician to initiate or maintain the prescription at issue. General claims of overpromotion are not sufficient." *In re Zyprexa Prods. Liab. Litig.,* 649 F.Supp.2d 18, 33 (E.D.N.Y.2009) (internal citations omitted). "In order to defeat a motion for summary judgment, an assertion of overpromotion must be well-supported factually." *In re Zyprexa Prods. Liab. Litig.,* 489 F.Supp.2d 230, 268 (E.D.N.Y.2007).

 As Plaintiffs correctly note, the overpromotion exception "has not been analyzed by the Courts of this jurisdiction." Opp. at 23. Even if this exception were to be recognized here, the Court finds that Plaintiffs have failed to establish that a reasonable jury could conclude that AstraZeneca overpromoted Seroquel, thus nullifying the written warnings as to the risk of tardive dyskinesia and barring AstraZeneca from invoking the learned-intermediary doctrine.

In urging this Court to recognize the overpromotion exception, Plaintiffs point to *Salmon v. Parke, Davis and Co.,* 520 F.2d 1359 (4th Cir.1975). In *Salmon,* the Fourth Circuit found that there was "slight" evidence of overpromotion that precluded summary judgment where the physician had received a calendar advertising the drug, and it was

> foreseeable that a calendar might remain on a physician's desk as a constant reminder to prescribe a drug long after the sample and its warning had been removed. A jury could infer, therefore, that the absence of a warning on an advertisement for the use of a drug as potentially dangerous as chloromycetin was a form of overpromotion which nullified the effect of even a valid warning on the package.

*Id.* at 1363. Additionally, Plaintiffs point to *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971), *abrogated on other grounds by, Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980), in support of their overpromotion argument. *See* Opp. at 24–25. There, the Pennsylvania Supreme Court affirmed a verdict for a plaintiff where the jury had considered whether "the printed words of warning were in effect cancelled out and rendered meaningless" in light of the manufacturer's sales efforts. *Incollingo,* 282 A.2d at 220. Specifically, the court found there was evidence in the record that the sales force had "minimized the dangers of the drug while emphasizing its effectiveness, wide acceptance and use, and lack of certain objectionable side effects associated with other drugs." *Id.* at 221; *see also* Opp. at 23 (citing additional cases in support of overpromotion exception). While Plaintiffs generally claim that AstraZeneca directed "aggressive marketing tactics" towards Maloney, Pls.' SMF, ¶ 2, they point to no direct evidence in the record to suggest that Maloney was ever exposed to messages minimizing the risk of Seroquel or promoting its off-label use.

With no such concrete evidence, Plaintiffs direct the Court to 31 visits by AstraZeneca sales representatives to Maloney between 2002 and 2007, and they seek to imply that Maloney would have been exposed to certain messages during those visits. *See id.,* ¶ 1 (citing Opp., Exh. 10 (AstraZeneca Disclosure of Available Case Specific Discovery Information and Documentation for Plaintiff Kay Patteson), Exh. A (Call Note spreadsheet)); Opp. at 10. Repeated visits by sales representatives to a physician regarding a pharmaceutical drug alone, however, do not constitute overpromotion—there must be a link between these visits and misinformation that would make the prior warnings ineffective. *See Dean,* 387 Fed.Appx. at 30. In *Dean,* the Second Circuit declined to apply the overpromotion exception where there was "no record evidence indicat[ing] that over promotion induced prescription" of the drug to the plaintiff. *Id.* Importantly, the court recognized that "[a]lthough the record reflects a vigorous sales campaign" aimed at the treating physician, there was "no evidence that [the manufacturer's] salespeople either misled [the treating physician] about the link between Zyprexa and diabetes or caused [the treating physician] to prescribe Zyprexa to [plaintiff]." *Id.; see also Beale,* 492 F.Supp.2d at 1377–78 (court found that plaintiffs had failed to raise genuine issue of fact to support overpromotion exception where there was "simply no evidence offered by Plaintiffs on summary judgment that Dr. Diaz was influenced by any of Biomet's marketing materials to induce him to inappropriately select patients for the device"; instead, court concluded that "Dr. Diaz used his considerable experience—implanting more than 10,000 joint replacements in his career—and independent research and judgment in making his patient selection decisions").

The Court is presented with similar facts here, given that there is no evidence suggesting that AstraZeneca's representatives minimized the risk of tardive dyskinesia or encouraged off-label use of Seroquel to treat insomnia during any of their visits with Maloney. Indeed, Plaintiffs' brief concedes this, couching their arguments surrounding the promotional efforts as "probable" or "likely," rather than as factual. *See, e.g.,* Opp. at 10 ("*it is probable* that the AstraZeneca sales representatives included the message that Seroquel was an effective sleep aid, and that the true dangers of the drug were misstated"; "Dr. Maloney ... *was likely led to conclude* that Seroquel was an appropriate treatment for Mrs. Patteson's insomnia" (emphasis added)).

Plaintiffs' speculation surrounding the promotional messages Maloney may have received is in fact contradicted by Maloney himself. Maloney stated that he could not recall any specific promotional messages that he received in any of the visits with AstraZeneca representatives, Maloney Dep. at 178:9–17, or that any of the representatives suggested he should prescribe Seroquel to treat insomnia. *Id.* at 159:10–13. In an attempt to link Maloney to the alleged overpromotion, Plaintiffs submit an affidavit from Stefan P. Kruszewski, M.D., stating that "AstraZeneca did in fact promote for numerous off label uses, including as a sleep aid. I make this assertion based on direct promotion to me as well as direct promotion to numerous psychiatric and neurologic physicians known to me." Opp., Exh. 9 (Affidavit of Stefan P. Kruszewski), ¶ 25. The Kruszewski affidavit, however, is not based on any personal knowledge regarding the visits of AstraZeneca sales representatives to Maloney; instead, he bases his assertion on inferences from his own experience, *see id.,* and his review of the representative call notes, *id.,* ¶¶ 37–38, to conclude that in his "opin-

ion," "Dr. Maloney was told, on multiple occasions, that Seroquel had the same risk for tardive movement disorders/EPS as 'placebo,' and thus, that Seroquel does not cause EPS or tardive movement disorders." *Id.*, ¶ 40. Yet, in the end, Kruszewski's opinions and extrapolations create no genuine issue of fact when confronted by Maloney's first-hand testimony.

Furthermore, there is no evidence that Maloney was in any way influenced by the visits from AstraZeneca sales representatives or that these efforts altered the manner in which he prescribed Seroquel. Indeed, the efforts by the sales representatives seem to have had little to no impact on Maloney, who could not even recall the substance of any of his conversations with them. Maloney Dep. at 178:9–17. In contrast, both *Salmon* and *Incollingo*—the cases dating back more than thirty years that Plaintiffs rely on to advance their overpromotion argument—hinged on the impact that the sales efforts had on the physicians' treatment plans. *See Beale*, 492 F.Supp.2d at 1377 (discussing fact that in *Salmon* and *Incollingo*, "[t]he physicians prescribing the drug testified that they were influenced by the representations of the detail men, and prescribed the drug much more freely than they would have without those representations").

With no evidence regarding Maloney's exposure to the alleged overpromotion of Seroquel and no evidence that such efforts influenced his treatment of Patteson, Plaintiffs cannot avail themselves of the overpromotion exception—even if the exception were to be recognized in this jurisdiction. The learned-intermediary doctrine thus applies, and AstraZeneca's warning to Maloney excuses it from a duty to warn Patteson. Summary judgment is thus warranted for that Defendant.

### B. *Dr. Maloney*

Defendant Maloney, of course, cannot invoke the learned-intermediary doctrine since he himself is the intermediary. Indeed, he rests the entirety of his Motion for Summary Judgment on the relevant statute of limitations found in District of Columbia Code, § 12–301. *See* Maloney Mot. at 4–5. Plaintiffs contend that this argument fails for two reasons. First, Plaintiffs argue that their claims against Maloney were timely filed under the "continuing treatment rule." *See* Opp. at 12–13. And second, Plaintiffs maintain that even if this rule does not apply, there are nonetheless factual disputes surrounding the date from which the statute of limitations began to run that preclude summary judgment. *See id.* at 13–22. The Court agrees, finding that Maloney cannot prevail on his statute-of-limitations argument for either of these two reasons. It will, accordingly, deny his Motion for Summary Judgment.

#### 1. *Continuing–Treatment Rule*

Under District law, Plaintiffs' negligence claims are subject to a three-year statute of limitations. *See* D.C.Code § 12–301. Such a limitations period is subject to "the continuing treatment rule," which tolls the period for filing suit for claims arising from a doctor's treatment "until the doctor ceases to treat the patient in the specific matter at hand." *Anderson v. George*, 717 A.2d 876, 878 (D.C.1998). This rule is premised on the unique physician-patient relationship " 'marked by trust and confidence,' " where "both the patient and the client are 'necessarily at a disadvantage to question the reason for the tactics employed or the manner in which the tactics are executed.' " *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 770 (D.C.1997) (quoting *Siegel v. Kranis*, 29 A.D.2d 477, 288 N.Y.S.2d 831, 834 (1968)). Because of this unique relation-

ship, the D.C. Court of Appeals has reasoned that " 'it would be ludicrous to expect a patient to interrupt a course of treatment by suing the delinquent doctor.' " *Id.* (quoting *Siegel,* 288 N.Y.S.2d at 834). "[T]he period of tolling ends once the particular treatment 'at hand' ends, since that treatment no longer would be jeopardized by an interfering lawsuit." *Berkow v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses and Missionaries Conducting Sibley Mem'l Hosp.,* 841 A.2d 776, 782 (D.C.2004).

Ms. Patteson first began treatment with Maloney on or about May 30, 2006. *See* Maloney SUF, ¶ 2. Maloney treated her complaints regarding "depression, anxiousness, chronic insomnia, and, serious alcohol abuse/dependence." *Id.,* ¶ 3. He first began prescribing Seroquel in June of 2006 to treat her insomnia. *See* Pls.' SMF, ¶¶ 13, 14. Patteson continued to see Maloney during the time that she began experiencing "weakness in her lower extremities and difficulty walking." *Id.,* ¶ 16. From June to August 2007, Patteson continued to receive treatment from Maloney, while at the same time receiving medical treatment from other specialists, including Dr. Bernad, Dr. Beliles, and Dr. Jacobson. *See id.,* ¶¶ 24–27. While the extent of Patteson's contact with Maloney between August 2007 and December 31, 2007, is unclear, at an appointment in late December, he "continued to tell her that he did not know what was causing her symptoms." *Id.,* ¶ 30. Patteson was not discharged from Maloney's treatment until February 1, 2008, though the record provides little information about any contact she had with him in early 2008. *Id.,* ¶ 40.

 The evidence in the record thus supports Plaintiffs' argument that Ms. Patteson was under Maloney's care and continuing to receive treatment for the same health conditions through at least the end of 2007, and arguably through February 2008. Because she was receiving ongoing treatment for the same conditions through this period of time, the statute of limitations did not start running until at least three years from the end of 2007. Her filing of the Complaint on September 9, 2010, is clearly within the three-year statute and thus was timely. As a result, Maloney's argument that Plaintiffs' claims are barred by the statute of limitations cannot prevail.

#### 2. Discovery Rule

 Even in the absence of the continuing-treatment rule, the Court would nonetheless find Maloney's limitations argument deficient because of the "discovery rule." This rule provides that a plaintiff's cause of action does not accrue until "one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Bussineau v. President & Dirs. of Georgetown Coll.,* 518 A.2d 423, 435 (D.C.1986). The standard of "some evidence of wrongdoing" is "far from a precise one," *Diamond v. Davis,* 680 A.2d 364, 380 (D.C.1996); however, "subsequent cases makes it clear that the plaintiff need not have knowledge of the precise breadth or nature of the tortious action." *Brin v. S.E.W. Investors,* 902 A.2d 784, 792 (D.C.2006) (internal citations omitted). "[A] medical opinion that the wrongdoing is a plausible cause of the known injuries will trigger the running of the statute of limitations," as armed "with some medical opinion that the perceived evidence of wrongdoing is a plausible cause of the illness, the plaintiff can be expected to promptly seek additional medical and legal advice to illuminate the causal issue." *Id.* at 794.

 Here, the record is equivocal regarding the substance of the medical opin-

ion Maloney claims to have given Plaintiff and the timing of when she could have been expected to seek additional medical advice surrounding the link between Seroquel and the symptoms she was experiencing. Maloney claims that "Plaintiff was informed by Dr. Maloney that he was discontinuing her Seroquel because it may have contributed to her neuromuscular difficulties. Both parties agree that this conversation took place and it is further reflected in Dr. Maloney's office notes dated August 3, 2007." Maloney Mot. at 5. Patteson recalls the discussion very differently, stating that "Dr. Maloney again told her that he did not know what was causing her symptoms. He also told her that he was going to cut down her dosage of Seroquel because she had been on it for a long time and there was a possibility that it was aggravating her limp." Pls.' SMF, ¶ 22. It is far from undisputed that this conversation constitutes a medical opinion by which Patteson would be on notice that Seroquel was the plausible cause of her symptoms, especially where her "physicians were clear in admitting that they did not know what was causing her symptoms throughout the summer and fall of 2007," Opp. at 19, and that her "symptoms continued to be ill-defined and doctors repeatedly confirmed that she was difficult to diagnose." *Id.*

 Given the conflicting accounts of what transpired in the August 3, 2007, consultation, as well as subsequent events that raise questions about when accrual actually occurred, the Court is presented with questions of fact that must be resolved by the factfinder. Courts have cautioned:

> Although "[w]hat constitutes the accrual of a cause of action is a question of law . . . [,] when accrual actually occurred in a particular case is a question of fact" to be resolved by the fact-finder. "In all

cases to which the discovery rule applies, the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances." Otherwise put, "[u]nless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as a matter of law, the jury should decide the issue on appropriate instructions."

*Brin*, 902 A.2d at 795 (internal citations omitted). Because the record raises factual disputes surrounding the information Maloney provided to Plaintiff linking her symptoms to her use of Seroquel and when such information may have been provided, the Court finds that even if the continuing-treatment rule did not apply, summary judgment based on the statute of limitations would nonetheless be premature at this juncture.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant Defendant AstraZeneca's Motion for Summary Judgment and deny Defendant Maloney's.

**SO ORDERED.**